CHOI & ITO
Attorneys at Law

CHUCK C. CHOI
ALLISON A. ITO
700 Bishop Street, Suite 1107
Honolulu, Hawaii 96813
Telephone: (808) 533-1877
Fax: (808) 566-6900
Email: cchoi@hibklaw.com
aito@hibklaw.com

Proposed Attorneys for Debtor
and Debtor-in-Possession

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| In re<br><br>KAUMANA DRIVE PARTNERS, LLC, dba Legacy Hilo Rehabilitation & Nursing Center,<br><br>     Debtor and<br>     Debtor-in-Possession. | Bk. No. 19-01266<br>(Chapter 11)<br><br>Date: [to be set]<br>Time:<br>Judge: Hon. Robert J. Faris |

## DECLARATION OF BENJAMIN L. MEEKER IN SUPPORT OF "FIRST DAY" MOTIONS

**BENJAMIN L. MEEKER** declares, under penalty of perjury, that:

  1.  I am President of Kaumana Drive Partners, LLC, dba Legacy Hilo

Rehabilitation and Nursing Center, the debtor and debtor-in-possession herein (the

1

"Debtor"). I am custodian of records for the Debtor's business, and am familiar with its books and records.

2. This Declaration is submitted in Support of the Debtor's First Day Motions, including:

- Application to Employ Choi & Ito as General Bankruptcy Counsel to the Debtor

- Motion For Order Authorizing Debtor to Use Cash Collateral; ("Cash Collateral Motion")

- Motion For Order Authorizing Debtor To Pay Pre-Petition Wages And Other Employment-Related Costs And Expenses And To Honor Pre-Petition Employee Benefits ("Wage Motion")

- Motion For Order Under 11 U.S.C. §§ 105(A) And 366(C) (I) Prohibiting Utilities From Altering Or Discontinuing Services On Account Of Pre-Petition Invoices, And (II) Establishing Procedures To Determine Requests For Additional Assurance Of Payment ("Utilities Motion")

- Motion for Order Authorizing Continued Use of Existing Cash Management System and Bank Accounts

3. I am a licensed attorney in the State of California. I have been the President of the Debtor since June, 2017.

4. Except as otherwise indicated, all of the facts set forth in this Declaration are based upon my personal knowledge and my review of relevant documents. I am competent to testify to the matters herein set forth and, if called upon to do so, I could and would testify to the facts set forth herein.

## DEBTOR'S BUSINESS AND PRE-PETITION SALE NEGOTIATIONS

5. The Debtor is the owner of a 100 bed skilled nursing facility in Hilo, Hawaii, commonly referred to as the Legacy Hilo Rehabilitation and Nursing Center ("Legacy Hilo" or the "Facility").

6. The Facility is a state-of-the-art structure completed in 2015. It is a single story structure located on approximately 17.6 acres of land with 48,597 square feet of gross interior space. The Debtor holds licensure from both CMS (Centers for Medicare & Medicaid) for participation in in the Medicare program as well as from the State of Hawaii Department of Health for participation in the Medicaid program. The Facility's patient census is currently 74.

7. As a Medicare/Medicaid licensed "SNF" the Debtor provides specialized services to its patients through licensed professionals, including room and board, nursing care provided by registered professional nurses, physical therapy, occupational therapy, speech therapy, social services, medications, supplies, equipment, and other services necessary to the health of the patient. The Debtor has approximately 120 employees.

8. Substantially all of the Debtor's assets are subject to pre-petition liens held by CPIF WTB, LLC. ("CPIF"), as set forth more fully in the Debtor's Motion to Use Cash Collateral ("Cash Collateral Motion"), filed herewith. The balance of the CPIF loans as of the petition date is approximately $13.9 million. The CPIF

loans have matured and currently accrue default interest at the rate of 25% per annum, subject to the terms of the "Forbearance Agreement" described below. The Debtor has not paid CPIF since May, 2019.

9. Although the Debtor's monthly revenues totaled about $10 million in 2018 and its revenues through September 2019 were approximately $6.8 million, the Debtor has experienced liquidity issues because the Debtor has been unable to refinance the loans from CPIF due to the pending litigation described below.

10. In February, 2019, the Debtor received an unsolicited offer from Avalon Health Care Group ("Avalon") for the Facility. The Debtor engaged bankruptcy counsel and reached agreement on the terms of a Section 363 sale, subject to due diligence. Unfortunately, Avalon terminated negotiations in late June, 2019.

11. Shortly thereafter, the Debtor began negotiations for the sale of the Facility with the current proposed buyer.

12. Through counsel the Debtor continued forbearance discussions with CPIF over the past several months. The Debtor and CPIF agreed that the Debtor should file a chapter 11 petition with a bona fide stalking horse bidder under contract if possible.

13. Pursuant to a Forbearance, Additional Advance, and Sale Support Agreement made effective as of September 26, 2019 (the "Forbearance

4

Agreement"), CPIF as lender and the Debtor, and related entities (as borrowers parties) agreed, among other things, that CPIF would (a) make a further additional advance of $220,000.00 under the loan documents to pay certain critical vendors immediately before the petition date, (b) support the proposed sale of the Legacy Hilo as described below, and (c) waive substantially all of its default interest if a transaction is consummated and CPIF receives payment in full by January 31, 2020.

14. CPIF also consents to the Debtor's use of cash collateral and has agreed to a "carve out" for professionals of $350,000.00 as set forth in the proposed cash collateral stipulation attached to the cash collateral motion filed herewith.

15. Effective as of September 30, 2019, the Debtor entered into a Management Services Agreement (the "Management Agreement") and a Purchase and Sale Agreement ("PSA") with HILO SNF, LLC ("HILO SNF").[1]

16. HILO SNF is owned by Ohana Pacific Management Company, Inc. ("Ohana") which owns and operates five skilled nursing facilities, two adult day health centers, a home health agency, and a management company in Hawaii with a total of 509 beds on the islands of Oahu and Kauai.

---

[1] The Management Agreement and the PSA are attached to the Debtor's Motion to Approve Bid Procedures for Sale of Substantially All of Debtor's Assets and Related Relief filed herewith and set for hearing on November 4, 2019.

U.S. Bankruptcy Court - Hawaii   #19-01266   Dkt # 8   Filed 10/06/19   Page 5 of 16

17. Under the Management Agreement, HILO SNF will manage the Facility for a period of approximately three months, when the PSA is scheduled to be consummated. The total fees payable under the Management Agreement is $200,000.00 but these fees will accrue and be "credited" against the purchase price under the PSA.

18. The PSA provides for the purchase and sale of the Legacy Hilo for $17.5 million to HILO SNF subject to overbid from qualified bidders. The PSA also provides for a 60-day due diligence and 30 day period to close. The contract deadline to consummate the sale with HILO SNF is December 31, 2019.

DEBTOR'S CURRENT FINANCIAL CONDITION

19. As of the petition date, the Debtor had approximately $305,852.00 (exclusive of patient/resident trust of $27,473.94) in cash and approximately $2.1 million in receivables. After CPIF, the Debtor's second largest creditor is the State of Hawaii Department of Taxation which is owed an estimated $1.6 million on account of delinquent general excise taxes. The Debtor estimates that it has approximately $2 million in general unsecured liabilities, inclusive of significant disputed claims.

20. The Debtor's four-month cash collateral budget through January 31, 2020, shows adequate liquidity through the period since the approximately $130,000 in monthly interest payments to CPIF will not be made. The budget

6

U.S. Bankruptcy Court - Hawaii   #19-01266   Dkt # 8   Filed 10/06/19   Page 6 of 16

contemplates the payment of all other post-petition expenses, including general excise taxes and professionals

DEVELOPMENT OF THE FACILITY WITH EB-5 FUNDING AND LITIGATION

21. The Debtor is owned by Regency Venture Fund, LLLP, a Hawaii limited liability limited partnership ("RVF"). The RVF partnership is owned 49% by 37 Chinese limited partners and 51% by general partner Hawaiian Islands Regional Center, LLC, a Hawaii limited liability company ("HIRC"). HIRC is the sole general partner of RVF. The sole managing member of HIRC is TAH Management, LLC a California limited liability company ("TAH"). I am the sole managing member of TAH, the managing member of HIRC.

22. The Debtor was organized for the purpose of developing owning and operating a skilled nursing facility in Hilo. RVF was organized as an investment vehicle for the EB-5 immigrant investor program under U.S. immigration laws. RVF's 37 limited partners each made a $500,000.00 capital contribution to RVF under the EB-5 Program (plus a separate $50,000.00 "administrative fee"). Each investor signed a Subscription Agreement by which they made representations to RVF regarding their fitness to make the investment and agreed to be bound by the RVF Limited Partnership Agreement as limited partners in the (RVF) Partnership.

7

23. RVF in turn used these EB-5 payments to make an $18.5 million loan to the Debtor for development of the nursing care facility in 2012 and construction on the facility began in 2012. At that time, the Debtor was controlled by third-party individuals not affiliated with RVF or HIRC. The RVF loan was secured by the project. The Partnership's loan to Kaumana was secured by the project.

24. The Debtor defaulted on the RVF loan in 2014, and instead of foreclosing on the Debtor, RVF (through HIRC) acquired the facility through a deed in lieu based on advice of Hawaii legal counsel. HIRC was concerned that a foreclosure may result in the Facility's Certificate of Need ("CON") being revoked due to a change in ownership of the Facility. HIRC was also concerned about the waste of the asset that would occur if the project sat unfinished during a prolonged foreclosure process. Lastly, in order to fulfill their obligations under the EB-5 Program, the 37 limited partners had to demonstrate job creation within a specific period of time which could not occur if the construction, opening, and operations of the Facility were delayed by a judicial foreclosure proceeding.

25. Consequently, RVF acquired control of the Debtor through a "Membership Interest Purchase Agreement" in December, 2014. In April, 2016, RVF acquired 100% of the membership interest in the Debtor. The Debtor was released of its obligations under the RVF loan.

26. On October 18, 2017, approximately 21 of the 37 limited partners in RVF filed a lawsuit in the Circuit Court of the First Circuit for the State of Hawaii, styled <u>Lu vs. Regency Venture Fund LLLP et al.</u>, case no. 17-1-1699-10 JPC (the "Investor Lawsuit"). Plaintiffs have sued, among other defendants KDP, RVF, HIRC, and myself, and Andre Hurst and alleged, various breach of fiduciary claims and mismanagement (among other things, alleging that HIRC's decision to take back the unfinished Facility damaged the limited partners). RVF has filed a countersuit against the plaintiffs.

27. On November 17, 2017, Plaintiffs filed an *Ex Parte Motion for Temporary Restraining Order and Motion for Preliminary Injunction*. The Circuit Court denied the relief after an evidentiary hearing.

28. To date the Investor Lawsuit resulted in the accrual of over $1 million in legal fees, and prevented management from focusing on the goal of stabilizing operations and cash flow and refinancing the CPIF loans. In 2018, total revenues were just under $10 million, but expenses for 2018 exceeded $11 million including over $1 million in legal fees associated with the Investor Lawsuit. More importantly, the Investor Lawsuit prevented the refinance of the CPIF loans.

**FIRST DAY MOTIONS**

29. The Debtor is filing concurrently herewith various "first day" motions and applications. The relief requested in the motions and applications will enable

the Debtor to continue to operate effectively. Accordingly, the Debtor requests that all of the "first day" motions and applications be granted in their entirety.

        A.      <u>CASH COLLATERAL MOTION</u>

30. I have reviewed the Motion for Order Authorizing Debtor to Use Cash Collateral Pursuant to 11 U.S.C. § 363(c)(2) (the "Cash Collateral Motion").

31. All of the facts set forth in the Cash Collateral Motion are true and correct to the best of my knowledge, information and belief.

32. Attached to the Cash Collateral Motion as <u>Exhibit A</u> is a true and correct copy of the proposed cash collateral stipulation between CPIF and the Debtor.

33. Attached to the Cash Collateral Motion as <u>Exhibit B</u> is a true and correct copy of a Financing Statement and Lien Report (the "UCC Report") for the Debtor dated as of March 21, 2019. The only UCC creditors identified in the UCC Report are: (a) Xynergy Healthcare Capital II LLC in connection with a purchase agreement for accounts (which transaction has been consummated and the lien should have been released); and (b) CPIF.

34. Attached to the Cash Collateral Motion as <u>Exhibit C</u> is a true and correct copy of the cash flow budget for the period for the four months ending January 31, 2020.

35. Attached to the Cash Collateral Motion as <u>Exhibit D</u> is a true and correct copy of the Forbearance Agreement.

36. Based on the historical data, and after examining the Debtor's business, making reasonable and conservative assumptions regarding projected operations, and considering the impact of the bankruptcy process on operations, the Debtor projects that the aggregate levels of cash will decrease during the course of this proceeding.

    B.    <u>MOTION TO PAY PRE-PETITION WAGES</u>

37. I have reviewed the Motion for Order Authorizing Debtor to Pay Pre-Petition Wages and Other Employment-Related Costs and Expenses and to Honor Pre-Petition Employee Benefits ("Wage Motion"). The facts regarding the operation of the Debtor, particularly those facts pertaining to the wages and benefits paid to the Debtor's employees as set forth in the Wage Motion, are true and correct to the best of my knowledge, information, and belief.

38. Payment of the employee wages and benefits as requested will prevent disruption to the Debtor's operations and preserve the goodwill of the Debtor for the benefit of all of the Debtor's creditors.

39. Attached to the Wage Motion as <u>Exhibit A</u> is a true and correct copy of a list showing the net pay received by the Debtor's employees for the period ending September 7, 2019.

40. Attached to the Wage Motion as <u>Exhibit B</u> is a true and correct copy of a list showing the total accrued vacation and sick pay for the Debtor's employees as of September 1, 2019.

C. <u>MOTION FOR ORDER AUTHORIZING CONTINUED USE OF CERTAIN BANK ACCOUNTS</u>

41. I have reviewed the Motion for Order the Continued Use of Certain Bank Accounts ("Bank Account Motion"). All of the facts set forth in the Bank Account Motion are true and correct to the best of my knowledge, information and belief.

42. If the Debtor were to have to set up new accounts for the Depository Account and the Resident Trust Account, the Debtor would have to devote a large number of hours to accomplish that result, for no monetary benefit, and the result would be unnecessary administrative problems with automatic deposits and payments.

43. Nearly all of the Debtor's receivables are transmitted electronically through the Depository Account. The Depository Account is currently set up such that payors (such as Medicare, UHC, HMSA, Alohacare and Ohana Wellcare) can make direct deposits into the Depository Account. Requiring the Debtor to close the Depository Account and open a new account would cause significant delay (in excess of four to six month) in receiving payment from these payors.

44. The Resident Trust Account is a trust fund deposited by certain residents. This is a service provided by the Debtor to facilitate a patient's ability to pay out-of-pocket expenses and is required to be maintained and available to the residents under Medicare and Medicaid guidelines. In addition, these funds are used to reimburse the facility for Medicaid eligible residents to pay the facility their monthly cost share amount or for direct deposits from the Social Security Administration where the Debtor is the representative payee.

45. I expect that if anyone ever had a question about the post-petition use of the existing bank accounts, either I or other people in the employment of the Debtor could easily identify whether payments or deposits were made before or after the Petition Date.

46. With modern software tools and the bank accounts being online, the Debtor can easily account for every single debit or credit item for each account. The Debtor can access its account activity and download the information onto spreadsheets. These tools enable the Debtor to easily create a daily report itemizing each debit and credit entry, and the Debtor can add data to the spreadsheet identifying each of the account transactions, if that degree of information would ever be required.

47. If the Motion is granted, the Debtor will type or stamp the designation "Debtor-in-Possession, Case No. _____" on each of the Debtor's checks and the

Debtor will update the title of the Depository and Resident Trust Accounts to include such designation.

> D. APPLICATION FOR ORDER APPROVING EMPLOYMENT OF CHOI & ITO, ATTORNEYS AT LAW, AS COUNSEL TO THE DEBTOR

48. In the Application for Order Approving Employment of Choi & Ito, Attorneys at Law as Counsel to Debtor ("C&I Employment Application"), the Debtor moves the Court for an interim and final order authorizing the Debtor to retain the law firm of Choi & Ito, Attorneys at Law ("C&I") as its general counsel for its Chapter 11 bankruptcy proceedings.

49. The Debtor requires a law firm to represent it during the bankruptcy proceeding. The Debtor wishes to retain C&I as its bankruptcy counsel.

50. The Debtor is informed C&I has considerable experience in representing debtors under chapter 11 of the Bankruptcy Code. I believe that it is in the best interest of the Debtor's estate that C&I be employed to represent the Debtor effective as of the Petition Date.

> H. UTILITIES MOTION

51. I have reviewed the Motion for Order Pursuant to 11 U.S.C. § 366 Prohibiting Utilities from Altering, Refusing or Discontinuing Services and Determining that Adequate Assurance of Payment for Future Utility Services has been Provided to Utilities ("Utilities Motion"). All of the facts set forth in the

Utilities Motion are true and correct to the best of my knowledge, information and belief.

52. The Debtor will be able to continue to pay on a current basis the cost of operating its business, including the payment of Utilities (as defined in the Utilities Motion) in full on a monthly basis in the ordinary course of its operations.

53. Attached to the Utilities Motion as <u>Exhibit A</u> is the most recent itemized list of all Utilities which presently provide service to the Debtor. The list also shows that for a typical month, the combined total of all payments to be made to the Debtor's Utilities is approximately $30,000.

54. In order to minimize any loss of value and disruption to the Debtor's business, the Debtor intends to engage in business as usual following the commencement of their Chapter 11 cases, with as little interruption to its operations as possible. I believe that if this Court grants the relief requested in each of the first day motions the Debtor has filed, the prospect for achieving this objective, to the maximum benefit of creditors and the Debtor's estate, will be greatly enhanced.

55. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: Carlsbad, California, October 6, 2019.

_____
BENJAMIN L. MEEKER